ASJZ/JW: USAO#2023R00515



**SEALED**

USDC - BALTIMORE
'23 AUG 3 PM 3:55

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA | * CRIMINAL NO. SAG-23-269 |
| v. | * |
| REGINALD DAVIS, | * (Wire Fraud, 18 U.S.C. § 1343; Money Laundering, 18 U.S.C. § 1957; Forfeiture, 18 U.S.C. §§ 981 and 982, 21 U.S.C. § 853(p), and 28 U.S.C. § 2461(c)) |
| Defendant | * |

\*\*\*\*\*

## INDICTMENT

### COUNT ONE
### (Wire Fraud)

The Grand Jury for the District of Maryland charges that:

At all times relevant to this Indictment:

### Relevant Individuals and Entities

1. Defendant **REGINALD DAVIS ("DAVIS")** was a resident of Maryland.

2. In or about June 2015, Strong City Baltimore ("SCB") was established in the State of Maryland as a non-profit organization serving individuals, community associations, institutions, and businesses in Baltimore.

3. From at least on or about September 14, 2015, to at least on or about May 1, 2021, SCB operated a general checking account at Bank 1 with account number ending in x4485 (the "4485 account"). This bank account was used as SCB's general operating account for the next seven years, including for funds that were given to SCB by its fiscal clients for restricted purposes. As outlined further below, beginning no later than August 2016, SCB improperly used client assets with donor restrictions to fund operating expenses.

1

4.      Beginning in or about November 2019, **DAVIS** began working at SCB as Chief of Staff, and in or about April 2020, **DAVIS** became the Interim Chief Executive Officer ("CEO") of SCB.  In or about April 2021, **DAVIS** became the CEO of SCB. **DAVIS** resigned from SCB in or about December 2022.

5.      Non-Profit 1 was a Baltimore-based non-profit organization dedicated to fostering research, encouraging education, and providing support for individuals with a particular medical condition. In the years prior to 2018, Non-Profit 1 existed as an independent non-profit organization.  In or about January 2018, Non-Profit 1 entered into a fiscal sponsorship arrangement with SCB.  Under the arrangement, SCB would provide administrative 'backbone' support for Non-Profit 1, including fiduciary services, governance, and funds management.  In return, SCB would receive a regular payment from Non-Profit 1 for services rendered.

6.      In or about October 2019, Non-Profit 1 signed a Memorandum of Agreement with SCB that stated, among other things, "Strong City (the Fiscal Sponsor) agrees to . . . [d]eposit funds received on behalf of the Sponsored Project into a restricted set of funding sources in Strong City's fiscal management system."  After this agreement was signed, Non-Profit 1 continued to send and direct funds to SCB, including donations.   These funds were placed in the 4485 account and were not restricted in any way.  SCB used these funds to pay general expenses unrelated to Non-Profit 1.

7.      From in or around April 2020, to in or around July 2020, Non-Profit 1 merged with Non-Profit 2, a larger Maryland non-profit organization with a similar purpose.

8.      Non-Profit 3 was a Baltimore-based non-profit organization dedicated to providing programs that educate, empower, and uplift diverse communities. On or about October 30, 2018, Non-Profit 3 entered into a fiscal sponsorship arrangement with SCB, which contained a similar agreement, as described above in paragraph 6, in which SCB agreed to deposit Non-Profit 3's

funds into a restricted set of funding sources. SCB, however, did not set up a restricted set of funding sources for funds related to Non-Profit 3.

9. Non-Profit 4 was a Baltimore-based non-profit organization focused on assisting individual home renovators and small community developers. On or about July 22, 2016, Non-Profit 4 entered into a fiscal sponsorship arrangement with SCB, which contained an agreement by SCB to provide services with integrity and responsibility and noted that "funds must be disbursed according to strict IRS [Internal Revenue Service] standards." SCB did not set up a restricted set of funding sources for funds related to Non-Profit 4.

10. Non-Profit 5 was a Baltimore-based non-profit organization that worked on providing a safe space for youth that promoted positive thinking skills. Prior to August 2020, Non-Profit 5 entered into a fiscal sponsorship arrangement with SCB similar to those described above in paragraph 6. SCB did not set up a restricted set of funding sources for funds related to Non-profit 5.

11. Beginning no later than in or about August 2016, and continuing through at least December 2019, SCB received funds and improperly used client assets with donor restrictions to fund its own operating expenses contrary to its agreements with the clients to safeguard those funds on the clients' behalf.

## The Paycheck Protection Program

12. The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was a federal law enacted in or around March 2020, which was designed to provide emergency financial assistance to the millions of Americans who were suffering the economic effects caused by the COVID-19 pandemic. One source of relief provided by the CARES Act was the authorization of up to $349 billion in forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as the Paycheck Protection Program ("PPP"). In or

3

around April 2020, Congress authorized over $300 billion in additional PPP funding.

13. In order to obtain a PPP loan, a qualifying business was required to submit a PPP loan application, which was signed by an authorized representative of the business. The PPP loan application required the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan. In the PPP loan application, the small business (through its authorized representative) was required to state, among other things, its: (a) average monthly payroll expenses; and (b) number of employees. These figures were used to calculate the amount of money the small business is eligible to receive under the PPP.

14. A PPP loan application was required to be processed by a participating lender, such as a financial institution. If a PPP loan application was approved, the participating lender funded the PPP loan using its own monies, which were 100% guaranteed by the Small Business Administration ("SBA"). Data from the application, including information about the borrower, the total amount of the loan, and the listed number of employees, was transmitted by the lender to the SBA in the course of processing the loan.

15. PPP loan proceeds were required to be used by the business on certain permissible expenses—payroll costs, interest on mortgages, rent, and utilities. The PPP allowed the interest and principal on the PPP loan to be entirely forgiven if the business spent the loan proceeds on these expense items within a designated period of time and used a certain percentage of the PPP loan proceeds on payroll expenses.

16. The SBA servers that process PPP loans are located outside of the District of Maryland.

**Relevant Financial Institution**

17. Bank 1 was an FDIC-insured SBA-authorized PPP lender headquartered in

Pittsburgh, Pennsylvania. At all times relevant to this indictment, Bank 1 participated as a lender in the PPP.

18. Borrowers applied for PPP loans online through Bank 1's website by creating an account. Borrowers were then able to enter information pertinent to the PPP loan application, including but not limited to payroll costs and number of employees. Borrowers also uploaded supporting documentation and signed loan documents electronically through the account. Once a loan was approved, it would be funded by Bank 1.

## SCB's Mismanagement of Non-Profit Client Funds

19. On or about January 24, 2018, Non-Profit 1 transferred approximately $451,866.19 to SCB for fiscal management. SCB entered the full amount of Non-Profit 1's funds into the 4485 account and did not segregate the funds or make any attempt ensure that the money was used only for Non-Profit 1.

20. SCB provided regular statements of revenue and expenditures to Non-Profit 1 and, after its merger, to Non-Profit 2. These statements listed "ENDING FUND BALANCE" for Non-Profit 1. SCB's total assets were often significantly less than what SCB represented belonged to Non-Profit 1. For example, on or about July 31, 2019, SCB reported to Non-Profit 1 that Non-Profit 1 had approximately $653,000 in an "ENDING FUND BALANCE." In truth and in fact, at that time, SCB's total assets on hand were approximately $286,000. On or about January 31, 2020, SCB reported to Non-Profit 1 that Non-Profit 1 had approximately $827,000 in an "ENDING FUND BALANCE." In truth and in fact, at that time, SCB's total assets on hand was approximately $339,000, a shortfall of over $480,000.

21. On or about August 28, 2020, a member of the leadership team of Non-Profit 2 spoke by phone with **DAVIS** about ending Non-Profit 2's fiscal relationship with SCB and creating a payment schedule for SCB to transfer back to Non-Profit 2 its total outstanding funds,

which equaled approximately $600,000. **DAVIS** agreed that SCB would provide the total outstanding balance to Non-Profit 2 with an initial 25% payment, to be followed by four equal payments that were to be made by January 2021. **DAVIS** assured Non-Profit 2's representative that SCB was able to meet this obligation but needed to manage the disbursements over a longer period of time because of financial demands across SCB's "portfolio of organizations."

22.     On or about August 31, 2020, **DAVIS** emailed two members of the leadership team associated with Non-Profit 2. **DAVIS** wrote that he was "looking forward" to working to help "close out" the relationship between Non-Profit 2 and SCB.

23.     On or about November 1, 2020, a member of the leadership team associated with Non-Profit 2 emailed an SCB employee and copied **DAVIS** regarding next steps. The email stated, "Tomorrow afternoon I will be meeting with the law firms which represent [Non-Profit 2]. I am truly sorry we were not able to work this out, even when we agreed to your proposed terms. It is a horrible story, if not worse, in the making!"

24.     On or about December 4, 2020, a member of the leadership team associated with Non-Profit 2 emailed an SCB employee stating that:

> We have now received $319K of an estimated $929K due to [Non-Profit 1]. That leaves a balance of approximately $610K. The last payment was received on November 7. We communicated a number of times during November regarding determining the next payment date . . . and unfortunately there has been no positive movement that I am aware of at this time. I can only do so much on my end and need something that will show there is reason for us to continue to pursue this outstanding balance in good faith.

25.     On December 4, 2021, the SCB employee responded that he was "working diligently on my end to develop a clear and practical distribution of [Non-Profit 1] funds with our finance team . . . and hope to have a clear and practical written plan for you on or before December 11 [2020] . . . I am requesting 'grace' to develop this plan and ensure you that I am working on 'good faith' with you to ensure all your funds are received." In truth and in fact, Strong City's

6

total assets at that time was approximately $248,000.

26. On or about December 4, 2020, an individual associated with Non-Profit 1 responded:

> Like many of your fiscally sponsored organizations, $600K to [Non-Profit 1] is like $6M to a larger organization. In addition, much of this money was given to [Non-Profit 1] with restrictions and entrusted to Strong City to protect on their behalf. To me, there is really no higher calling than protecting donor dollars and ensuring we ultimately carry out their wishes. Strong City continues to hold the vast majority of all of [Non-Profit 1's] resources and without them, ultimately children will go undiagnosed and some may well lose their lives.

27. On or about March 10, 2021, approximately eight months after initiating the fiscal sponsorship close-out process with SCB, an employee of SCB stated in response to questions from Non-Profit 1's representatives, that "we anticipate liquidating the totality of funds within a two week period." At that point, the totality of funds owed by SCB to Non-Profit 1 was approximately $610,207.00. SCB's total assets on hand were approximately $261,000.

28. On or about March 12, 2021, an SCB employee emailed SCB Board members and copied **DAVIS**, stating, "[SCB]'s deficit of $1.7 million is due to overextension in project expenditures. We financed the over spending by using [an earlier 2020 PPP loan] ($1.2 million), and project funds (which should have been held in trust) – hence the liability to [Non-Profit 1] and others of over $600k."

### March 2021 PPP Loan

29. On or about March 13, 2021, Bank 1 approved SCB's PPP loan.

30. As of the date of this indictment, the March PPP loan has not been forgiven, nor have any payments been made toward the outstanding balance.

### The Scheme to Defraud

31. Between in or around January 2021, and continuing until in or around May 2021, **DAVIS** and others known and unknown to the Grand Jury devised and intended to devise a scheme

7

to defraud Bank 1 and to obtain money and property from Bank 1 by means of materially false and fraudulent pretenses, representations, promises, and material omissions, with intent to defraud and with knowledge of the scheme's fraudulent nature ("the scheme to defraud").

### Purpose of the Scheme to Defraud

32.  It was the purpose of the scheme to defraud for **DAVIS** to fraudulently obtain or attempt to obtain a PPP loan on behalf of SCB, in order to cover shortfalls in SCB's accounts that were owed to the fiscally-sponsored organizations.  These shortfalls had arisen because SCB improperly used assets with donor restrictions to pay SCB operating expenses, including salaries to its own employees.

### Manner and Means of the Scheme to Defraud

It was part of the scheme to defraud that:

33.  From in and around January 2021, to in and around March 2021, **DAVIS** submitted and caused to be submitted to Bank 1 multiple PPP loan applications on behalf of SCB, which eventually resulted in one loan being granted.

34.  In the PPP loan applications, **DAVIS** made and caused to be made false and fraudulent statements, under penalty of perjury, including false statements regarding the intended use of the PPP funds.

35.  **DAVIS** caused Bank 1 to issue a PPP loan.

36.  **DAVIS** and others known and unknown to the Grand Jury caused PPP funds to be deposited into SCB controlled bank accounts.

37.  **DAVIS** sent emails to SCB staff, which resulted in interstate wire communications, regarding PPP applications, including describing uses for the PPP funds that were not permitted by the terms of the PPP loans that **DAVIS** signed.

38.  **DAVIS** and others known and unknown to the Grand Jury caused at least $650,000 of the PPP funds to be used to cover previously-existing liabilities to fiscally-sponsored organizations that had arisen because of SCB's previous improper use of restricted assets to pay operating expenses.

## 2021 PPP Applications

39.  In furtherance of the scheme to defraud, on or about January 19, 2021, **DAVIS** caused SCB to open a new bank account ending in x3365 (the "3365 account") at Bank 1. **DAVIS** was the signatory on the account on behalf of SCB. No funds were placed in the account.

40.  From on or about January 20, 2021, through on or about March 1, 2021, **DAVIS** submitted and caused to be submitted six (6) separate PPP applications on behalf of SCB reporting varying amounts of average monthly payroll:

| Date | Number of Employees | Average Monthly Payroll | Total Loan Amount Sought |
| --- | --- | --- | --- |
| 1/20/2021 | 100 | $700,803 | $1,752,006 |
| 2/12/2021 | 100 | $700,803 | $1,752,006 |
| 2/19/2021 | 100 | $677,677 | $1,694,192 |
| 2/25/2021 | 100 | $677,188 | $1,692,970 |
| 2/28/2021 | 100 | $677,188 | $1,692,970 |
| 3/1/2021 | 100 | $570,769 | $1,426,922 |

41.  **DAVIS** digitally signed all applications, including the final March 1, 2021 application. The application contained the following statement:

> The funds will be used to retain workers and maintain payroll; or make payments for mortgage interest, rent, utilities, covered operations expenditures, covered property damages costs, covered supplier costs, and covered worker protected expenditures as specified under the Paycheck Protection Program Rules; I understand that if the funds are

9

knowingly used to unauthorized purposes, the federal government may hold me legally liable, such as for charges of fraud.

42. **DAVIS** initialed next to this acknowledgement statement, signifying that he understood these terms.

43. On or about March 13, 2021, **DAVIS** forwarded to an employee of SCB an e-mail that he had received from Bank 1 notifying him that SCB's application for a PPP loan had been approved. The employee replied, "HALLELUJAH PRAISE THE SBA!!!!!"

44. On or about March 15, 2021, at approximately 1:23 a.m. **DAVIS** wrote to an SCB employee: "In anticipation of the funds, let's plan to discuss the expenses proposed to be paid and the timeline. Please put together a priority list. Among my list please it should include outstanding AP [accounts payable], outstanding rent and CAM, [Non-Profit 1], and board member loans." Neither payments for board member loans nor debt settlement with Non-Profit 1 were allowable uses of PPP funds.

45. On or about March 15, 2021, at 2:18 p.m., **DAVIS** electronically signed the PPP note with the bank, agreeing to the disbursement of funds.

46. On the same day, **DAVIS** sent an email to the leadership of Non-Profit 1 stating "We are preparing to process the full liquidation payout for [Non-Profit 1]. [SCB Employee] will follow up with you on next steps."

47. On or about March 16, 2021, Bank 1 deposited approximately $1,426,922 in PPP funds into the 4485 account.

### SCB's Misuse of the PPP Funds to Pay Pre-Existing Liabilities

48. On or about March 23, 2021, **DAVIS** caused $800,000 to be transferred from the 4485 account to the 3365 account. Immediately prior to the transfer, the 4485 account had a balance of approximately $1,487,991, of which at least $1,100,000 represented PPP loan proceeds.

An official at Bank 1 encouraged **DAVIS** to transfer the funds because there had been ongoing fraudulent activity in the 4485 account. Prior to the transfer, the 3365 account had a negative balance of approximately $20.00. No money had ever been deposited, and the account had been assessed a twenty-dollar Corporate Account Analysis Charge.

49. On or about March 26, 2021, **DAVIS** caused approximately $4,861.55 to be wired from the 4485 account to Non-Profit 3 to close out Non-Profit 3's fiscal sponsor arrangement. Although Non-Profit 3 had previously terminated its fiscal sponsorship arrangement with SCB in September 2020, SCB provided no reason for the delay in payment to Non-Profit 3. Neither **DAVIS** nor any other SCB employee informed Non-Profit 3 that these funds were the proceeds of a PPP loan, or that there were any restrictions on the use of funds.

50. On or about March 29, 2021, the full balance of $799,980.00 was transferred from the 3365 account back to 4485 account. That amount represented the $800,000 of PPP loan proceeds minus the $20.00 debit in the 3365 account.

51. On that same day, an SCB Employee signed an agreement with Non-Profit 1, stating that "both parties agree to a final balance amount of $609,633.38 due from Strong City Baltimore. Strong City Baltimore and [Non-Profit 1] also agree that this balance corresponds to the final amount entrusted to Strong City Baltimore in its role as fiscal sponsor."

52. On or about April 1, 2021, $609,633.38 in funds was transferred from the 4485 account to Non-Profit 2. Neither **DAVIS** nor any other SCB employee informed Non-Profit 2 that these funds were the proceeds of a PPP loan, or that there were any restrictions on the use of funds.

53. On or about April 2, 2021, $10,910.71 was transferred from the 4485 account to Non-Profit 4 to close out its fiscal sponsorship arrangement. Non-Profit 4 had previously terminated its fiscal sponsorship arrangement with SCB in June 2020. SCB provided no reason for

11

the delay in payment to Non-Profit 4. Neither **DAVIS** nor any other SCB employee informed Non-Profit 4 that these funds were the proceeds of a PPP loan, or that there were any restrictions on the use of funds.

54. On or about April 9, 2021, $6,252.39 was transferred from the 4485 account to Non-Profit 5. Neither **DAVIS** nor any other SCB employee informed Non-Profit 5 that these funds were the proceeds of a PPP loan, or that there were any restrictions on the use of funds.

## The Charge

55. On or about March 16, 2021, in the District of Maryland and elsewhere, the defendant,

**REGINALD DAVIS,**

for the purpose of executing and attempting to execute the scheme to defraud, did knowingly transmit and cause to be transmitted by means of wire communication, in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, to wit: a wire of transfer of $1,426,922 from Bank 1, located outside Maryland, to the 4485 account, located within Maryland.

18 U.S.C. § 1343
18 U.S.C. § 2

## COUNTS TWO AND THREE
### (Money Laundering)

The Grand Jury for the District of Maryland further charges that:

### Introduction

1. The allegations in Paragraphs 1 through 30, and 31-54 of Count One are incorporated here.

### The Charges

2. On or about the dates listed below, in the District of Maryland and elsewhere, the defendant,

### REGINALD DAVIS,

did knowingly engage and attempt to engage in the following monetary transactions by, through, and to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, that is, the transfer and withdrawal of funds, as set forth below, such property being derived from a specified unlawful activity, that is, wire fraud, in violation of 18 U.S.C. § 1343:

| COUNT | APPROXIMATE DATE | DESCRIPTION OF MONETARY TRANSACTION |
|---|---|---|
| 2 | March 23, 2021 | Transfer of more than $500,000 from the 4485 account to the 3365 account. |
| 3 | March 29, 2021 | Transfer of more than $500,000 from the 3365 account to the 4485 account. |

18 U.S.C. § 1957

## FORFEITURE ALLEGATION

The Grand Jury for the District of Maryland further finds that:

1. Pursuant to Fed. R. Crim. P. 32.2, notice is hereby given to the defendant that the United States will seek forfeiture as a part of any sentence in accordance with 18 U.S.C. §§ 981(a)(1)(C) and 982, 21 U.S.C. § 853(p), and 28 U.S.C. § 2461(c), in the event of the defendant's conviction on any of the offenses alleged in Counts One through Three of this Indictment.

### Wire Fraud Forfeiture

2. Upon conviction of the offense alleged in Count One in this Indictment, the defendant,

**REGINALD DAVIS,**

shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the scheme to defraud.

### Money Laundering Forfeiture

3. Upon conviction of an offense alleged in Counts Two and Three in this Indictment, the defendant,

**REGINALD DAVIS,**

shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(1), any property, real or personal, involved in such offenses, or any property traceable to such property.

### Substitute Assets

5. If any of the property described above, as a result of any act or omission of the defendant:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third

    c.    has been placed beyond the jurisdiction of the Court;

    d.    has been substantially diminished in value; or

    e.    has been commingled with other property that cannot be divided without difficulty;

the United States shall be entitled to forfeiture of substitute property up to the value of the forfeitable property described above pursuant to 21 U.S.C. § 853(p), as incorporated by 18 U.S.C. § 982(b)(1) and 28 U.S.C. § 2461(c).

18 U.S.C. § 981(a)(1)(C)
18 U.S.C. § 982(a)(1) and (b)(1)
21 U.S.C. § 853(p)
28 U.S.C. § 2461(c)

_____
Erek L. Barron
United States Attorney

A TRUE BILL:

**SIGNATURE REDACTED**    Date: 8/3/23
Foreperson

15